The next case on the calendar is National Retirement Fund v. Metz Culinary Management. May it please the Court, Your Honours, to calculate withdrawal liability, a plan actuary has to assess the sufficiency of the plan's current assets to pay benefits that will be owed by the plan in the future, 10, 20, 30 years in the future. And so a key actuarial assumption, the one that actually makes the most difference to the end result, is the time value of money. What is the interest rate or discount rate that we're going to use to translate these present values into future values or vice versa? This fund, for many years through 2013, through its actuaries at a firm called Buck, used the normative approach to answering that question, which is they looked at the anticipated investment experience of the plan over the long term, and that's what they used to discount the benefits to present value. And that makes perfect sense, because if the plan expects that $100 in its assets today will be worth $150 in 10 years as a result of growth through investment, then an obligation to pay $150 in pension benefits in 10 years should be valued at $100 today. And that's what Buck did. And they did that not only for withdrawal liability. The key question here is whether the fund can set the interest assumption after the measurement date. The question is, what is the assumption? Which assumptions apply to the calculation? The argument was that the fund couldn't make that calculation or pick the number after the key measurement date. The argument is that they can't change. Isn't that? Or they can't change it? Yes. Right. Well, that's how you frame it. The district court said the rate doesn't become the rate by inertia. It actually has to be set. But aren't those legal questions subject to de novo review? That's really what I'm asking. Okay. There's a legal question and there's a factual question. The legal question is, which date do you look to to determine which assumptions to apply? And then the factual question is, what were the assumptions that were in place on that date? So I think there's both pieces to it here. There's no dispute or debate about what the measurement date is, is there? Right. There's no dispute that the measurement date is the last day of the 2013 plan year. And so our position is the assumptions that were in place, the plan's approach that was in place in 2013, is the approach that has to be used to calculate the unfunded vested benefits for purposes of METS's withdrawal. And I think it's clear from the Form 5500 document that the plan filed covering the 2013 plan year. And they filed it in 2014. So they filed it after the plan year had ended. And they said in that report, our interest rate assumption for 2013 is 7.25%. And that's because for all of 2013, the plan actuary was Buck, and Buck's approach was to use the investment return assumption to discount the liabilities. And correct me if I'm misunderstanding, but I thought that that figure was referring to withdrawals that took place in 2013. We look backwards. So that document, am I incorrect about that? I think that that, I think you are, Your Honor. The document says, the document doesn't have any qualifications. It says the interest rate assumption we use, we use for minimum funding purposes, which is this other set of rules under RISA for withdrawal liability for various other purposes, is 7.25%. Now, it's true that calculations that Buck did within the 2013 year would have been done as of 2012. But that doesn't change the fact that Buck's approach was, we look to the investment return assumption when we're trying to present value the benefit, the future benefits. And that approach was in place throughout 2013. And it was not changed until Horizon, this new firm that took over for 2014, said, essentially as a policy matter, we're going to do something different, something that is quite novel, actually, in this field, which is we don't care what the plan is going to earn on its investments. Yeah, we agree. They're going to earn 7.25% per year on average over the long term. We don't care. We're going to peg this. Arbitration, though, right? Well, I think that's right. There is, and I think it's important for the Court to understand, there is also this separate problem with what the fund did here, which is even prospectively using the PBGC rates is unlawful. But that would go to the substantive reasonableness question. Not so much reasonableness. The statute requires that the assumptions be both reasonable and the best estimate of anticipated experience under the plan. This doesn't even purport to be anticipated experience under the plan. And you can look at the memo that Horizon wrote when it made this change. It has nothing to do with anticipated experience. The anticipated experience remains 7.25% growth. What they said was we're going to use this essentially risk-free 3% rate instead because we want to deter employers from withdrawing. But in terms of what is before us today, your argument, and help me if I'm misunderstanding it, but your argument is that it was impermissible for them in June to say we're changing the assumptions and methods. But the statute, so far as I can tell, is silent as to when the assumptions, and you have to look backwards to the measurement date, but it's silent as to when the assumptions and methods must be set for the preceding year. Yeah, I think the legal question is what does it mean to do the calculation as of the measurement date, right? So the statute does say that. I think everyone agrees. The measurement has to be done as of the last day of the prior plan year. And our position is just, okay, if you're looking at the last day of the prior plan year, you want to look at sort of the facts, the state of the world as it stood at that time, and the assumptions that the information with respect to the state of the world as of that date doesn't become available until later. I agree with that, Your Honor. And so it makes sense that you would look at it later. I agree with that, Your Honor. I don't disagree with that, Your Honor. You're looking back. You're trying to put yourself in the position you were in at that time, and it may be that things happened at the end of the year that you have to incorporate because you're trying to figure out, well, what were really the facts as of that date. But with respect to this actuarial assumption, first of all, there was no change, and we know that because the 5500 that was filed was filed in November of 2014, many months after the end of the plan year. And the actuaries didn't say, well, the rate was 7.25% until December 1st, and then something happened, and so we changed it. They said it's 7.25% for the entire year. And so there's no issue here. The district court was sort of focused on, well, what would happen if there were some development at the end of the year that would require revisiting the assumptions. But there was no such development here, and the 5500 makes that very clear. That's page 194 of the appendix. Again, this is filed after the fact. It's looking back, and it's saying for the entirety of the plan year, 7.25% is our approach. And it wasn't until many months later when Horizon said, okay, starting in 2014, we are the plan actuaries. We want to do things differently, and that may be fine. It's actually not fine for the reason I said earlier, but assuming that that's fine, that has to be applied prospectively to withdrawals that occur in the subsequent plan year. And to read the statute, any other? Yes. To follow up on Judge Livingston's question from earlier, when was the rate set? I mean, had Buck set the rate for the calculation that applied here, that is METS's withdrawal? Well, what Buck did was Buck said, for 2013, we are the plan actuaries, and this is our approach. Our approach is we want to figure out how much the plan is going to earn on its investments, and we're going to use that. METS withdraws in May of 2014. Right. Its measurement date is 12-31-2013. Correct. And so it's the interest assumption rate as of that date. Correct. Had Buck set that date before? Buck had set it before, and Buck reaffirmed it after. When did Buck set it before? Oh, it was set. That's not my understanding of what the district court is saying. Yeah. So Buck, I mean, the rate had not changed in many years, but Buck set it in November 2013 in the actuary evaluation that they published, and then they reaffirmed. Setting in November 2013 what the rate will be as of December 31, 2013. Well, let me add, and then they reaffirmed in the 5500, which was filed in November 2014, that this extended through the entirety of the plan year. In essence, then, they're setting it in late 2014 as well. Well, no, because they were saying that as of 2013, in other words, for the entirety of 2013, nothing happened that would cause us to change this assumption that had been in place for many years. And so I think it's important that these two filings by Buck bookend the measurement date. Right. We have November 2013. The actuary evaluation says, this is our approach. It's seven and a quarter. And then we have November 2014 when they're publishing this official filing that sets forth the plan assumptions, and they say, you know, it was seven and a quarter for the entirety of the plan year. So there's no argument that anything changed before the measurement date. And as a result, if we're looking at the measurement date, and that's the date where we want to fix the assumptions to ensure that we don't have retroactivity problems or due process problems, then seven and a quarter is the rate that has to be used. Thank you, Your Honors. Good morning, Your Honors. Ronald Richmond, Sheltie Roth and Zabel for the National Retirement Fund. It is not correct to say that Buck set the rate for the measurement date of 12-31-13. As a district court judge recognized. In fact, if you look at the 5500 that was filed by Buck, because they did the actuarial evaluation for 2013, because it was a lot cheaper to do it that way, what they did is take the exact paragraph that appears in their actuarial evaluation of 2013 on actuarial assumptions interest. In fact, all of the assumptions are exactly the same from that appear in the actuarial evaluation in 2013 to the 5500. There was no change. And if we look at the actuarial evaluation that Buck did, which it rendered in November of 2013, and we look at the cover letter, A86 of the valuation, it is the first page. And that's dated November 2013. It's from the actuaries. It is to the Board of Trustees of the National Retirement Fund. And in the very first paragraph, Buck says, the valuation results presented in this report are for the plan year beginning January 1, 2013. The unfunded vested benefits reported for withdrawal liability purposes are measured as of December 31, 2012, which obviously does not apply to the calculation for METS's withdrawal liability. Then we go to A89, which is the actual first page of the report. And in the trustee summary, in the overview, it says, results are presented both for the determination of the contribution requirements and limits for the 2013 plan year and the determination of the plan's unfunded vested liability as of December 31, 2012. Fifth paragraph on that page says, for withdrawal liability purposes, the unfunded vested benefit liability at December 31, 2012, was $1.5 billion versus $1.4 billion at the end of the prior year, all focused on a measurement date of December 31. Well, the arbitrator said, and I think this is a quote from his opinion, the fund's assertion that the fund actuary had not made any interest rate assumption determination as of December 31, 2013, is rejected. Now, your argument is that that is not a factual conclusion? That is not a factual conclusion because the arbitrator's conclusion was a legal conclusion. What the arbitrator said, that absent an affirmative selection before the end of the year, before December 31st of 2013, that the old rate for 12-31-12 would roll over. I call it the rollover theory. And so under the arbitrator's rollover theory, the assumption used to calculate withdrawal liability for withdrawals occurring in 2014 must be adopted before 2014. Making sure I understand this correctly. If let's assume, I understand this is not what you say happened, but if the rate had been set in January or February, if the Horizon's predecessor had said, yes, we're still working here, and this is the rate, it would have been improper in June to say we're going to have a new rate, to establish that in October and apply it retroactively. As long as we're speaking about January or February of 2014, yes, that is correct. And the reason for that is simple, is that when we look at 4213 of the statute that governs actuarial assumptions, it calls for the actuary's best estimate. And if the actuary makes a best estimate in January or February of 2014, that's as of a measurement date of 12-31-13, that's their best estimate, and it would be inappropriate for the actuary to change that. The year the actuary took from appointment in October to the following fall to come up with a revised interest rate. That is correct, and it did so, though it was a factual matter not before the arbitrator, it did so because it was a new actuary, when a new actuary comes into a multi-employer pension plan, they have an obligation to look at what the old actuary did, look at the data, and make their own assumptions. And it also, because of the data that comes into a pension plan, which is not only participant data that comes in, that takes, in many cases, months. This is a plan with about 425,000 participants. It takes months for that data to come in. And the other part has to do with the assets of a plan. This is a large plan, and like many large plans, it has investments in private equity and other private investments for which the value is actually not determined for some period of time. So it does take a period, and can take a significant period of time. However, there is an incentive for the plan to actually assess withdrawal liability as soon as it can, because as soon as you can assess withdrawal liability is as soon as you can collect it. You can't collect it without assessing it. In addition, there is a section of ERISA, and that's 4219, which provides that the plan has an obligation to assess withdrawal liability as soon as practicable. So it is not that the plan has any interest, or the actuary has any interest in delaying the calculation, but they're supposed to get it right. In fact, in the district court in the oral argument, the Mets' counsel agreed that there was a seven-and-a-quarter rate in effect on 12-31-12, and that what the arbitrator concluded was that that rate just rolled over, because no new rate was chosen. And when we look at the statute, which, as Your Honors know, is a very comprehensive statute, especially when it comes to withdrawal liability, and you look at 4213 that sets actuarial assumptions, there is nothing in there that requires that the actuarial assumptions for withdrawal liability be set before the measurement date. I am going to spend a little bit of time about the issue of the second issue in the case, and that is the request by Mets to have this case go. Oh, I'm sorry. I'm sorry. I've been talking, and apparently you guys can't hear me. We can. I'm sorry, Your Honor. No, that's all right. Is there a drop-dead date by which the actuary has to make a decision as to the prior year's withdrawal liability? There is not a per se drop-dead date, except that in 4219 of the statute provides that the fund has to assess withdrawal liability as soon as practicable. And obviously that would depend on the circumstances, so there is not a specific date, but you can't be in a position of assessing withdrawal liability and therefore the opportunity to collect it without actually having assumptions to calculate that liability. With respect to the remand to the arbitrator issue, the arbitrator did not retain jurisdiction. That is apparent from the arbitrator's final award, and under the 4221B of ERISA, the district court has the ability to enforce, vacate, or modify the arbitrator's award. Now, Mets cites to three cases in their reply brief in which courts, one in this district, raised a question that they actually sent back to the arbitrator for additional information relating to the arbitrator's final award. Help me understand the record. As I understand it, the parties agreed that this preliminary issue would be addressed first and agreed to that procedure. So when the arbitrator acted, he wasn't thinking that he was resolving all potential issues in this arbitration. Well, at the beginning, the parties agreed that this would be a preliminary issue, but you cannot appeal a preliminary decision of an arbitrator to the district court. And Mets and the fund agreed that they wanted to have this appeal heard, and they agreed and asked the arbitrator to make a final judgment. And in making a final judgment, although the district court could have, if they needed some facts, and they didn't in this case, could have gone back to the arbitrator and said, look, we need some additional facts here for us to make our decision here. But that was not necessary in this case. And so what happens is that the arbitrator no longer has jurisdiction. Now, Mets can go back to the AAA and start another arbitration. You said that Section 1404B3 of the statute says that a district court treats an ERISA arbitration award the same way as an arbitration award under the FAA. And in the FAA context, I think what you would say here is the arbitrator didn't exhaust his function. It was clear on the record that with the district court's determination, if that determination is upheld, you remand back to the arbitrator. Well, the arbitrator was asked that question by counsel from Mets about whether, in fact, he would retain jurisdiction. And that occurred before the final judgment came out. And the arbitrator's answer is, well, it will be what it will be, meaning that he wasn't going to take a position with respect to that. And if we look at the Heil case, which is Second Circuit precedent and not under ERISA, this was a situation in which it was unclear from the arbitrator's award about who the award was against. And the court did not send the arbitration back to the arbitrator because it said it didn't have the ability to do that. What it did do, however, was send it back to the AAA, the American Arbitration Association. Thank you, Your Honor. Your Honor, just a couple of quick points. First, I think it's very clear from the Form 5500 that Buck's assumption of 7.25% was for the entirety of the 2013 plan year up to and including 1231. And so if we want to do the measurement as of 1231.13, the assumption that was in place at that time was 7.25%. And the notion that that was somehow limited to 2013 withdrawals as opposed to 2014 withdrawals, I think just misunderstands the whole approach that Buck had, which was we use one rate for everything. It's the rate that is drawn from our anticipated investment experience. And we don't care whether it's 2013 or 2014. That's our approach. And that approach was unquestionably in place for the entirety of the plan year. And at worst, Your Honors, that is a factual question as to the scope and the nature of Buck's assumption. And the arbitrator, with decades of experience in this field, drawing on the inferences from the documents and his understanding of the actuarial profession, rejected the fund's argument, which he characterized as a factual argument on page 30 of the appendix and then resolved it on page 37. So. If his reasoning is the rolling over theory, then that becomes a legal question, doesn't it? I don't think so because I think that was based on his understanding of how actuaries work and the way in which they do their job and the fact that, look, actuaries don't wake up every morning and reevaluate every assumption from first principles. They have an approach. They apply it. And if something changes, they revisit it. And I think he said nothing happened that caused them to revisit it, and therefore it remained in effect through 1231.13. If I could just quickly address the remand point. I just don't understand this argument. Yes, he issued a final judgment because he resolved a preliminary issue that resolved the case. But there were other preserved arguments. And if the ‑‑ I hope I've convinced you to reinstate the order, but if I haven't. He was equivocal as to whether he was ‑‑ He wasn't ‑‑ Hear it again. Well, he was equivocal because the district court didn't remand it back to him. In the exchange, he basically said it will be what it will be or something to that effect. Well, you know, I think he was not retaining jurisdiction because from his perspective he had finished with the case. But if and to the extent that this court disagrees with his or rejects his initial reasoning, there are all these other arguments that have not been addressed by anyone that have to be addressed. And we can't just go and start a new arbitration because there are time limits that have long since expired. And so it would be, I think, a very problematic due process issue if those arguments somehow disappeared just because he didn't have to reach them the first go around. So, again, I hope we've convinced you that the arbitrator's award should be reinstated on his own terms. But absent that, I think remand is the only appropriate disposition. There's no authority out there saying that remand is improper in this situation. And we've cited numerous cases that have done it. It, in fact, is very routine. If there are no further questions, thank you very much. Thank you both. We'll take it under submission. Thank you.